723 F.2d 319
 5 ITRD 1593, 1983-2 Trade Cases 65,758
 In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION
(D.C.MDL No. 189).
Appeal of ZENITH RADIO CORPORATION and National Union
Electric Corporation.
In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION
(D.C.MDL No. 189).
ZENITH RADIO CORPORATION, Appellant
v.
MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al. (D.C.Civ.
No. 74-2451).
In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION
(D.C.MDL No. 189).
NATIONAL UNION ELECTRIC CORPORATION, Appellant
v.
MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al. (D.C.Civ.
No. 74-3247).
In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION
(D.C.MDL No. 189).
ZENITH RADIO CORPORATION
v.
MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al. (D.C.Civ.
No. 74-2451).
 Nos. 80-2080, 81-2331, 81-2332 and 81-2333.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 21 and 22, 1982.
Decided Dec. 5, 1983.
 
 Edwin P. Rome (argued), Morris L. Weisberg, William H. Roberts, Arnold I. Kalman, Kathleen Herzog Larkin, Norman E. Greenspan, Margaret B. Dardess, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellants, Zenith Radio Corp. and Nat. Union Elec. Corp.; Philip J. Curtis, John Borst, Jr., Zenith Radio Corp., Glenview, Ill., of counsel.
 Asa D. Sokolow, Renee J. Roberts, Brian G. Lustbader, Rosenman, Colin, Freund, Lewis & Cohen, New York City, Joshua F. Greenberg, Randolph S. Sherman, Kaye, Scholer, Fierman, Hays & Handler, New York City, Franklin Poul, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellees, Sony Corp. and Sony Corp. of America.
 Louis A. Lehr, Jr., Stanley M. Lipnick, John L. Ropiequet, Carol R. Kanter, Arnstein, Gluck & Lehr, Chicago, Ill., Harry A. Short, Jr., Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., Philip M. Knox, Jr., Charles A. Tausche, Ann M. Coons, Law Dept. of counsel. Sears, Roebuck and Co. Chicago, Ill., Attorneys for Appellee, Sears, Roebuck and Co.
 Henry T. Reath, Terry R. Broderick, Duane, Morris & Heckscher, Philadelphia, Pa., Baker & McKenzie, Chicago, Ill., Hoken S. Seki, Seki, Jarvis & Lynch, Chicago, Ill., John T. Dolan, Arnold B. Calmann, Crummy, Del Deo, Dolan & Purcell, Newark, N.J., for appellee, Mitsubishi Elec. Corp.
 Charles F. Schirmeister, Charles Z. Krueger, Reid & Priest, New York City, Thomas N. O'Neill, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellees, Mitsubishi Corp. and Mitsubishi Intern. Corp.
 Donald Zoeller, Mudge, Rose, Guthrie & Alexander, New York City, Drinker, Biddle & Reath, Philadelphia, Pa., Liaison Counsel for appellees, for Toshiba defendants.
 Whitman & Ransom, New York City, Hunt, Kerr, Bloom, Hitchner, O'Brien & Conrad, Philadelphia, Pa., for Sanyo appellees.
 Thomas P. Coffey, E. Houston Harsha, Karl F. Nygren, Kirkland & Ellis, Chicago, Ill., Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Motorola appellee.
 Peter J. Gartland, Peter A. Dankin, Lance Gotthoffer, Edward H. Martin, Wender, Murase & White, New York City, Dechert, Price & Rhoads, Philadelphia, Pa., for Sharp appellees.
 Morgan, Lewis & Bockius, Philadelphia, Pa., Ira M. Millstein, A. Paul Victor, Joel B. Harris, Weil, Gotshal & Manges, New York City, for Matsushita appellees.
 Carl W. Schwarz (argued), William H. Barrett, Metzger, Shadyac & Schwarz, Washington, D.C., for Hitachi, Ltd., Hitachi Kaden Hanbai Kabushiki Kaisha and Hitachi Sales Corp. of America.
 H. William Tanaka, Lawrence R. Walders, B. Jenkins Middleton, Tanaka, Walders & Ritger, Washington, D.C., for Hitachi, Ltd., et al.
 Before SEITZ, Chief Judge, GIBBONS and MESKILL*, Circuit Judges.OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 The procedural history of this complex antitrust litigation has been set forth in the immediately preceding opinion. As described in that opinion, plaintiffs are Zenith Radio Corporation [Zenith] and National Union Electric Corporation [NUE]. Defendants are various Japanese and American companies. This opinion addresses plaintiffs' claims under section 801 of the Revenue Act of 1916, commonly known as the Antidumping Act of 1916 [1916 Act], 15 U.S.C. Sec. 72 (1976).
 
 I.
 
 2
 Plaintiffs' complaints charge that from as early as 1960 to the filing of the complaints, defendants, individually and collectively, have engaged in illegal dumping by selling consumer electronics products [CEPs] in the United States at prices substantially lower than in Japan. Dumping is "price discrimination between purchasers in different national markets." J. Viner, Dumping: A Problem in International Trade 4 (1923, reprinted in 1966). Analysis of plaintiffs' dumping claims in this case thus requires a price comparison between imported CEPs sold in the United States and CEPs sold in Japan.[1]
 
 
 3
 The 1916 Act makes it illegal to dump imported goods on the United States market with the purpose of destroying or injuring United States industry. The relevant text of the 1916 Act provides:
 
 
 4
 It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell, or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles ... in the principal markets of the country of their production ...: Provided, That such act or acts be done with the intent of destroying or injuring an industry in the United States ....
 
 
 5
 15 U.S.C. Sec. 72 (1976) (emphasis in original).
 
 
 6
 Plaintiffs' dumping claims reach this court from two different stages in the extended litigation of this complex antitrust case. First, the district court granted partial summary judgment against plaintiffs and dismissed the majority of their individual and conspiracy dumping claims. Zenith Radio Corporation v. Matsushita Electric Industrial Company, 494 F.Supp. 1190 (E.D.Pa.1980). That ruling was based on the district court's determination that all of the television products that defendants imported or sold in the United States, and those non-television products imported or sold in the United States that operated without batteries or that received FM transmissions, were not comparable under the 1916 Act to similar products sold in Japan. Because there can be no liability under the 1916 Act absent a price differential between comparable products, the district court dismissed all of plaintiffs' dumping claims as to these products.
 
 
 7
 Finding that there was a "substantial ground for difference of opinion" over the interpretation of the Act's comparability requirement, the district court certified its partial summary judgment order for interlocutory review by this court under 28 U.S.C. Sec. 1292(b) (1976). Plaintiffs filed a timely notice of appeal. Sharp Electronics Corporation separately urges affirmance of the summary judgment order on the alternative ground that the district court erred in ruling that the 1953 Treaty of Friendship, Commerce, and Navigation with Japan [Treaty], 4 U.S.T. 2063, T.I.A.S. No. 2863 (1953), did not bar plaintiffs' dumping claims under the 1916 Act. The order granting partial summary judgment is before this court as appeal No. 80-2080.
 
 
 8
 Before this court resolved that interlocutory appeal, the district court dismissed all of plaintiffs' antitrust claims and Zenith's residual dumping claims[2] and entered a final judgment on these claims under Fed.R.Civ.P. 54(b). Zenith Radio Corporation v. Matsushita Electric Industrial Company, 513 F.Supp. 1100 (E.D.Pa.1981). We have jurisdiction over Zenith's residual dumping claims under 28 U.S.C. Sec. 1291 (1976). This court ordered that oral argument on appeal No. 80-2080 be consolidated with argument on the appeals from the final judgment order. We address in this opinion the dumping issues presented by all those appeals.
 
 II.
 
 9
 On appeal from summary judgment, plaintiffs' claims under the 1916 Act present four issues. First, we must determine whether the Treaty bars any of plaintiffs' dumping claims. If any of plaintiffs' dumping claims survive that inquiry, we must determine the degree of product comparability required by the 1916 Act. If any of the products that defendants imported or sold in the United States are sufficiently comparable under the 1916 Act to products sold in Japan, we must then determine whether evidence in this summary judgment record creates a genuine issue of fact as to whether defendants "commonly and systematically" sold or agreed to sell CEPs in the United States at prices that were "substantially" lower than the prices at which comparable products were sold in Japan. Finally, we must determine whether evidence in this summary judgment record creates a genuine issue of fact as to whether defendants acted with specific predatory intent. Our standard of review is plenary.
 
 A. Treaty Issue
 
 10
 Sharp Electronics Corporation [SEC] is the only defendant to argue that the 1953 Treaty with Japan bars plaintiffs' claims under the 1916 Act. SEC is a New York corporation with its principal place of business in New Jersey. It is a wholly owned subsidiary of another defendant, Sharp Corporation, a Japanese corporation.
 
 
 11
 SEC imports CEPs from Japan and resells them in this country. It sells no CEPs in Japan. SEC argues that the Treaty bars application of the 1916 Act to its domestic resale pricing of Japanese-made CEPs and maintains that all of plaintiffs' dumping claims against it should be dismissed.
 
 
 12
 SEC relies on Article XVI of the Treaty, which provides as follows:
 
 
 13
 Products of either Party [Japan or the United States] shall be accorded, within the territories of the other Party, national treatment ... in all matters affecting internal taxation, sale, distribution, storage and use.
 
 
 14
 SEC argues that application of the 1916 Act to Japanese-made CEPs offered for resale in the United States discriminates against those goods in violation of Article XVI of the Treaty. The district court rejected this argument and held that the Treaty does not bar plaintiffs' dumping claims against SEC. We agree with that holding for several reasons.
 
 
 15
 First, Article XVI protects imported goods from discriminatory treatment only after the importation process has been completed and the goods are "within the territory of the other Party." Plaintiffs claim that SEC has violated the 1916 Act by importing CEPs into the United States at prices substantially lower than the prices at which comparable CEPs were sold in Japan. To the extent that the 1916 Act regulates this import activity, it does not discriminate against Japanese products that are "within the territory" of the United States. As SEC concedes, the Treaty does not restrict the rights of the United States to regulate imports.
 
 
 16
 Second, Article XVI prohibits discriminatory treatment only in matters "affecting internal taxation, sale, distribution, storage and use." The Treaty does not restrict the rights of the United States to regulate unfair competition from abroad. Article XIV(4) of the Treaty provides that "[e]ither Party may impose prohibitions or restrictions ... in the interest of preventing deceptive or unfair practices." The 1916 Act prohibits anticompetitive price discrimination between products imported or sold in the United States and comparable products sold in the exporting country. As a restriction on unfair trade practices, the 1916 Act is clearly a regulation allowed by the Treaty.
 
 
 17
 Third, Article XVI does not require that imported and domestic goods be given identical treatment. It only requires that imported goods be accorded "national treatment." Article XXII(1) defines that term to mean "treatment accorded within the territories of a Party upon terms no less favorable than the treatment accorded therein, in like situations, to ... products ... of such Party."
 
 
 18
 Section 2(a) of the Robinson-Patman Act, 15 U.S.C. Sec. 13(a) (1976), prohibits anticompetitive price discrimination between two products of "like grade and quality" where both sales occur in the United States. Zenith Corporation v. Matsushita Electric Industrial Company, 402 F.Supp. 244, 248-49 (E.D.Pa.1975). The 1916 Act likewise prohibits anticompetitive price discrimination between two comparable products where an imported product is sold at a lower price in the United States than in the exporting country. We do not believe that application of the 1916 Act to goods imported into or sold in the United States violates the mandate of Article XVI to accord "national treatment" to Japanese products sold in the United States.
 
 
 19
 For the reasons stated above, we hold that application of the 1916 Act to Japanese-made CEPs sold in the United States does not violate Article XVI of the Treaty.[3] Thus, we will affirm the partial summary judgment order of the district court insofar as it holds that the Treaty does not bar plaintiffs' dumping claims against SEC.
 
 B. Comparability
 
 20
 The first element necessary to a finding of dumping under the 1916 Act is proof that a price differential exists between two comparable products, one of which is imported or sold in the United States and the other of which is sold in the exporting country. During discovery, the district court required plaintiffs to pair models of CEPs sold in the United States with comparable models sold in Japan and to supply the model-by-model price comparisons on which they intended to base their dumping claims.
 
 
 21
 After plaintiffs filed their model-by-model price comparisons, defendants moved for summary judgment. Defendants argued that the models paired in plaintiffs' price comparisons were not comparable under the 1916 Act because of the technical differences that existed between them. Plaintiffs opposed defendants' motion by submitting affidavits that stated that the differences between the paired models were technically insignificant. Plaintiffs, however, do not dispute the existence of the technical differences.
 
 
 22
 The 1916 Act requires that the prices of products imported or sold in the United States be compared to the "actual market value or wholesale price of such articles" sold in the exporting country. The standard of comparability is not defined in the Act. The quoted language, however, should be interpreted in a manner consistent with the legislative purpose behind the enactment. The primary aim of the 1916 Act is to prohibit anticompetitive pricing.[4] Specifically, the Act prohibits price differentials which do not reflect legally significant product differences. It therefore becomes necessary to determine what constitutes a legally significant difference.
 
 
 23
 The district court correctly held that the 1916 Act does not require a comparison only between identical products. The history of the phrase "actual market value or wholesale price of such articles" supports this holding. That phrase is a term of art borrowed directly from the Tariff Act of 1913, and is defined in that Act: "the words 'value,' or 'actual market value,' or 'wholesale price,' whenever used in this Act, or in any law relating to the appraisement of imported merchandise, shall be construed to be the actual market value or wholesale price of such, or similar merchandise comparable in value therewith, as defined in this Act." Tariff Act of 1913, sec. III, p R, 38 Stat. 114, 189 (1913) (emphasis added).[5]
 
 
 24
 The district court also correctly rejected plaintiffs' argument that products are comparable under the 1916 Act as long as they are functional equivalents or in the same generic category. Such an expansive reading of the comparability requirement would be inconsistent with the intent of Congress to distinguish legitimate from anticompetitive pricing. Prohibiting price differentials between two non-identical products that serve the same function but appeal to different consumer preferences is as likely to interdict competitive as anticompetitive pricing. We would certainly expect the price of a television encased in a cabinet of fine mahogany to be different from the price of a television encased in a cabinet of inexpensive plastic, yet the mahogany and plastic sets are arguably functional equivalents.
 
 
 25
 The district court nevertheless held that most of the CEPs paired in plaintiffs' price comparisons were not comparable under the 1916 Act. According to the district court, the proper standards for measuring the technical differences between the CEPs were consumer use and preference, marketability, and commercial interchangeability. 494 F.Supp. at 1241. The district court held that the technological "significance" of these differences, and the accompanying differences in production costs, were irrelevant as a matter of law. Id. Because certain technical differences made CEPs sold in Japan inoperable in the United States, and vice versa, the court concluded that the CEPs were noncomparable. We cannot agree with this holding.
 
 
 26
 The technical differences between the television receivers sold in the United States and Japan are required by the different broadcast frequencies and the different power supplies available in the two countries. Similarly, the technical differences between non-television products sold in the United States and Japan are required by the different power supplies and the different radio frequency bands that the two countries assign to their FM radio transmissions. Thus, the only differences that we consider here between the products paired in plaintiffs' price comparisons result from the fact that the products sold in Japan have technical components that make them work in Japan, and those sold in the United States have technical components that make them work in the United States. Considered in terms of consumer utility--i.e., consumer use and preference, marketability, and commercial interchangeability--the purchaser of a CEP in Japan buys the same thing as the purchaser of a CEP in the United States, an operable CEP. Because the two consumers purchase the same thing, we would, absent other factors, expect them to pay the same price. The technical differences at issue, measured as a matter of consumer utility, cannot explain a price differential, and thus the two products are, absent other differences, comparable under the 1916 Act.
 
 
 27
 We also find ourselves unable to accept the district court's decision to exclude, as a matter of law, the factors of technical "significance" and production cost in determining whether the CEPs are comparable. These factors are clearly relevant. The district court asserted that there were disputed issues of material fact as to these two factors. None of the parties challenge this assertion on appeal, and we therefore do not review it.
 
 
 28
 We now turn to consider whether, on the record before us, we may affirm dismissal of any or all of plaintiffs' dumping claims on other grounds.
 
 C. Void for Vagueness
 
 29
 Defendants argue that a standard of comparability that permits a comparison of products possessing the technical differences discussed above renders the 1916 Act unconstitutionally vague. Under the doctrine of void-for-vagueness, "criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." United States v. National Dairy Products Corp., 372 U.S. 29, 32-33, 83 S.Ct. 594, 597-598, 9 L.Ed.2d 561 (1963).
 
 
 30
 Plaintiffs here seek only civil remedies under the 1916 Act. However, that Act is also a criminal statute, and the language on which plaintiffs base their civil claims also describes the criminal conduct that the Act proscribes. Assuming without deciding that civil legislation requires as much specificity under the Constitution as a criminal statute, we now address defendants' argument that the 1916 Act is unconstitutionally vague as applied to them.
 
 
 31
 Defendants' vagueness attack on this appeal is similar but not identical to the one made before the district court. In an early summary judgment motion before Judge Higginbotham, defendants argued that the language of the 1916 Act was so vague as to make the statute unconstitutional on its face. Judge Higginbotham rejected that argument and denied defendants' motion. Zenith Radio Corp. v. Matsushita Electric Industrial Co., 402 F.Supp. 251 (E.D.Pa.1975). Here, defendants argue that even if the statute is not invalid on its face, application of the 1916 Act to products possessing the technical differences discussed above makes the statute unconstitutionally vague.
 
 
 32
 For the reasons stated in Judge Higginbotham's opinion, we hold that the language of the 1916 Act is not so vague as to make the statute unconstitutional on its face. We also hold that applying the 1916 Act to products possessing the technical differences discussed above does not make that statute unconstitutionally vague.
 
 
 33
 A statute is not unconstitutionally vague if it describes the prohibited conduct with "a reasonable degree of certainty." Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952). We have held above that products are comparable under the 1916 Act so long as the price differences between them are not based on such legitimate factors as production costs or consumer preference. We believe that application of this standard of comparability does not make the Act so vague as to deny rights protected by the Due Process Clause. Thus, we will not affirm the district court's dismissal of plaintiffs' dumping claims on the ground that the 1916 Act is unconstitutionally vague.D. Price Differential
 
 
 34
 Assuming for the purposes of this appeal that the CEPs paired in plaintiffs' model-by-model price comparisons are comparable under the 1916 Act, plaintiffs must show that defendants sold CEPs in the United States at prices that were "substantially less" than the prices at which comparable CEPs were sold in Japan. Plaintiffs have produced several sources of evidence on this issue, all of which we have concluded are a proper part of this summary judgment record.[6]
 
 1. Model-by-Model Price Comparisons
 
 35
 In response to the district court's Trial Management Order, plaintiffs submitted two expert witness reports that contain detailed model-by-model price comparisons of the CEPs that defendants sold in the United States and in Japan. The report of Walter Lukas was prepared on behalf of NUE and concerns only television receivers. The report of Karl Horn and Vito Brugliera was prepared on behalf of Zenith and concerns television receivers, radios, phonographs, and tape and cassette recorders.
 
 
 36
 The experts performed an analysis of the technologies of various models of defendants' CEPs and from that analysis matched models of CEPs sold in the United States with comparable models sold in Japan. The experts then compared the prices of the paired models for various years within the alleged conspiracy. The price data contained in these model-by-model price comparisons is based on price data contained in defendants' Japanese commodity tax documents and defendants' answers to plaintiffs' interrogatories numbers 45 and 46 and supplemental interrogatories numbers 10 and 11.[7] Plaintiffs' Final Pretrial Statement [FPS] Vol. 17 at 8051.
 
 2. Other Expert Evidence
 
 37
 Plaintiffs have also presented expert testimony explaining price data such as that presented in the model-by-model price comparisons. For example, Part VI of Horace DePodwin's expert report analyzes all of the price data on television receivers that plaintiffs compiled during discovery. DePodwin concludes from his analysis that from 1967 to 1977, defendants sold television receivers in the United States at prices that were substantially less than the prices at which comparable television receivers were sold in Japan. DePodwin Report Part VI at 1836a-65a.
 
 
 38
 Similarly, the expert report of Stanley Nehmer analyzes price data for both television and non-television CEPs. Nehmer Report at 2352a-2474a. Nehmer concludes from this data that defendants charged "markedly lower prices for export products sold in the United States than they did for equivalent products sold in Japan." Nehmer Report at 2337a.
 
 
 39
 From this and similar evidence of price discrimination, we conclude that an issue of material fact exists as to whether defendants sold CEPs in the United States at prices that were substantially lower than the prices of comparable CEPs sold in Japan. Thus, we cannot affirm the district court's dismissal of plaintiffs' dumping claims on this ground.
 
 E. Specific Intent Issue
 
 40
 The 1916 Act does not require that all imports sold in the United States be priced at or above the home-market prices of comparable goods. To sustain a claim under the 1916 Act, plaintiffs must show that defendants priced the CEPs that they imported or sold in the United States with the "intent of destroying or injuring an industry in the United States." 15 U.S.C. Sec. 72. We now consider whether evidence in this summary judgment record creates a genuine issue of fact as to whether defendants acted with the specific intent required by the 1916 Act. In considering the evidence of intent, we address separately plaintiffs' conspiracy and individual dumping claims.
 
 1. Conspiracy Claims
 
 41
 Plaintiffs' complaints allege that defendants conspired to dump CEPs on the United States market. To prove such an agreement, plaintiffs rely on substantially the same evidence relied on to prove the conspiracy to sell products at artificially high prices in Japan and artificially low prices in the United States, as described in our preceding opinion. Proof of this agreement, however, requires evidence that defendants agreed to sell at dumping prices, evidence not required to create a genuine issue of fact as to the conspiracy.
 
 
 42
 The district court dismissed all of plaintiffs' conspiracy claims by way of summary judgment. In our preceding opinion, we vacated that judgment and held that, except as to Sony, Sears, and Motorola, material factual issues exist on plaintiffs' claims that defendants engaged in the alleged conspiracy. Slip Op. at VI A. Based on the evidence referred to in that opinion, combined with evidence discussed above that defendants sold at dumping prices, we hold that, except as to Sony, Sears, and Motorola, material factual issues exist concerning plaintiffs' allegations that defendants agreed to sell CEPs in the United States at prices that were substantially lower than prices at which comparable products were sold in Japan. However, this is not enough to make out a claim under the 1916 Act. Plaintiffs must also show that defendants conspired to dump with specific predatory intent.
 
 
 43
 To make out a claim that defendants conspired under the antitrust laws, plaintiffs need only show that defendants conspired with general intent to restrain trade. United States v. United States Gypsum Co., 438 U.S. 422, 445, 98 S.Ct. 2864, 2877, 57 L.Ed.2d 854 (1978). However, a showing of general intent does not necessarily constitute a prima facie showing of the specific intent required by the 1916 Act. See id. (distinguishing general from specific intent). After reviewing the record in this case, we hold that the evidence supporting plaintiffs' theory that defendants entered into the alleged conspiracy also creates a genuine issue of fact as to whether defendants agreed to dump CEPs on the United States market with the specific intent to destroy or injure an industry in the United States.
 
 
 44
 Evidence supporting plaintiffs' conspiracy theory would support an inference of predation in the United States market. This evidence is offered to show that the Japanese defendants agreed to stabilize prices at artificially high levels in Japan, insulating themselves by agreement from price-cutting competition at home. There is also evidence that defendants at the same time entered into an agreement to sell the fruits of the excess capacity of the Japanese CEP industry in the United States at low prices. We assume that the minimum price agreement, of which all the Japanese defendants were members, was mandated by the Ministry of International Trade and Industry [MITI]. Plaintiffs offer this evidence to show that defendants used the prices in that agreement as reference prices. Finally, plaintiffs point to evidence that defendants sought to conceal sales below MITI prices by a system of secret rebating.
 
 
 45
 The Japanese defendants also allegedly eliminated the possibility of price-cutting competition among themselves in the United States by agreeing to the Five-Company Rule and other customer allocation rules promulgated by the Japanese Machinery Exporters Association [JMEA], of which all the principal Japanese defendants were members. Those rules allocated to each member of the JMEA not more than five customers in the United States and prevented any two members from selling to the same customer. By thus allocating the market, defendants allegedly brought to bear the full force of their low-price conspiracy on their United States competitors in an effort to drive them out of the market.
 
 
 46
 Furthermore, plaintiffs' experts DePodwin and Nehmer summarized the evidence describing defendants' export policy. Both experts concluded that during the time of the alleged conspiracy, defendants operated an export cartel directed toward the United States with the specific intent to undersell their United States competitors and eventually to drive them out of business. See, e.g., DePodwin Report at 1725a, 1865a; Nehmer Report at 2327a, 2329a.
 
 
 47
 We believe that evidence in this summary judgment record creates a genuine issue of fact as to whether defendants conspired to dump CEPs in the United States with the specific intent to injure or destroy an industry in the United States. Thus, we will not affirm the district court's dismissal of plaintiffs' conspiracy claims under the 1916 Act on this ground.
 
 2. Individual Claims
 
 48
 Plaintiffs' complaints also charge each defendant with individual violations of the 1916 Act. Thus, we must determine whether evidence in this summary judgment record creates a material issue of fact as to plaintiffs' claim that each defendant dumped CEPs on the United States market with individual specific intent.
 
 
 49
 We have held that except as to Sony, Sears, and Motorola, there is sufficient evidence in this summary judgment record to create a genuine issue of fact as to whether each defendant was part of a conspiracy to dump CEPs in the United States. Even if the factfinder concludes that one of these defendants did not join that agreement, we hold that the evidence offered to tie each to that conspiracy creates a genuine issue of fact as to whether each dumped CEPs on the United States market with the specific intent to injure or destroy a United States industry. There is admissible evidence offered to show that each defendant joined in a conspiracy to sell at artificially high prices in Japan while at the same time selling at artificially low prices in the United States, that each defendant participated in the customer allocation rules so as to focus their predatory efforts on their United States competitors, that each defendant consistently sold CEPs in the United States at dumping prices over an extended period of time, and that each defendant except MELCO engaged in secret rebating throughout the alleged conspiracy. Although the rebating evidence has been challenged as inadmissible against MELCO, we hold that there is sufficient other evidence creating a genuine issue of fact as to whether MELCO engaged in individual dumping with the requisite intent. Thus, except as to Sony, Sears, and Motorola, we do not affirm the district court's dismissal of plaintiffs' individual dumping claims.
 
 
 50
 Because we have held that there is insufficient evidence tying Sony, Sears, and Motorola to either the conspiracy or an agreement to dump, plaintiffs' evidence of specific intent as to the individual dumping claims against these three defendants must stand independently from the evidence of specific intent offered to support plaintiffs' dumping claims against the other defendants. Unless there is sufficient evidence in the summary judgment record to create a factual issue as to whether Sony, Sears, or Motorola each acted with specific intent, we will affirm the district court's dismissal of all plaintiffs' dumping claims against them.
 
 
 51
 Plaintiffs' evidence that each of these three defendants acted with specific predatory intent is weak. Plaintiffs have produced no direct evidence that Sony, Sears, or Motorola sold low-price CEPs in the United States with the intent to injure or destroy the CEP industry in this country. The only circumstantial evidence in this record that even marginally supports the inference that these three defendants each acted with specific predatory intent is evidence that they sold imported CEPs at substantially lower prices in the United States than the prices at which comparable CEPs were sold in Japan, and evidence that they knew that the other defendants were engaging in similar activity and that concerted dumping could injure or destroy the CEP industry in the United States. Although this evidence might support a finding of general intent, we do not believe that this evidence creates a genuine issue of fact as to whether Sony, Sears, and Motorola each acted with the specific predatory intent required by the 1916 Act. Thus, we will affirm the district court's dismissal of all plaintiffs' dumping claims against Sony, Sears, and Motorola.
 
 III.
 
 52
 To the extent that the appeals in numbers 80-2080, 81-2331, 2332, and 2333 involve dumping claims against Sony, Sears, and Motorola, we will affirm the district court's judgment of dismissal. As to the judgment dismissing the dumping claims against the remaining defendants, we will reverse and remand for further proceedings.[8]
 
 
 53
 Costs will be taxed in favor of Sony Corporation, Motorola, Inc., and Sears, Roebuck & Co. against NUE and Zenith, and in favor of NUE and Zenith against the remaining defendants. Each party is directed to furnish to the Clerk of this Court within ten (10) days of the entry of judgment a brief written statement of its views as to allocation of costs among the parties. See Fed.R.App.P. 39(a).
 
 
 
 *
 Hon. Thomas J. Meskill, United States Circuit Judge for the Second Circuit, sitting by designation
 
 
 [1]
 Plaintiffs' dumping claims under the 1916 Act are to be distinguished from dumping proceedings under the so-called Antidumping Act of 1921 [1921 Act], 19 U.S.C. Sec. 160 (1976), repealed by Trade Agreements Act of 1979, tit. I, Sec. 106(a), 93 Stat. 144. The 1921 Act is administratively enforced and contains no provision for civil or criminal penalties or for treble damages. Unless otherwise noted, use in this opinion of the phrase "dumping claims" refers to claims under the 1916 Act
 
 
 [2]
 Because all of NUE's claims relate to television products, the district court dismissed all of NUE's dumping claims in the first order
 
 
 [3]
 In Sumitomo Shoji America v. Avagliano, 457 U.S. 176, 183, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982), the United States Supreme Court held that a wholly owned Japanese subsidiary that is incorporated in the United States "is not a company of Japan under the Treaty and is therefore not covered by Article VIII(1)." Article VIII(1) allows "[n]ationals and companies" of Japan to hire specified employees of their choice, arguably exempting such companies from Title VII of the Civil Rights Act of 1964. The national status of the company determines whether that company may claim the benefit conferred by Article VIII. The dispute in this case involves Article XVI, which protects the products of Japan from discriminatory treatment. Thus, it is the national status of the products and not the company with which we are concerned in this case. The holding in Sumitomo, therefore, is inapplicable here
 
 
 [4]
 In requesting that Congress enact a law prohibiting dumping, Secretary of Commerce William Redfield explained that the law should not prohibit the pricing practices of normal competition, but only those based on predatory motive. Annual Report of the Secretary of Commerce 43 (1915). The legislative history suggests that the majority party in Congress at the time passed the Act to deal with unfair competition, and we will interpret the Act in light of its motivating purpose. We are not unaware, however, that protectionist sentiment ran high in Congress and the country at the time. See Zenith, supra, 494 F.Supp. at 1217-23
 
 
 [5]
 Discussing product comparison under the Robinson-Patman Act, 15 U.S.C. Sec. 13(a) (1976), which prohibits price discrimination in domestic sales. Attorney General Herbert Brownell explained that "any anti-price discrimination statute designed to check unfair disparity in commercial treatment must ... come into play in ... business transactions involving the sale of nearly identical goods." Report of Attorney General's National Commission to Study the Antitrust Laws 157-58 (1955)
 
 
 [6]
 See, e.g., our previous opinion Slip Op. at section V D (reviewing the district court's evidentiary rulings)
 
 
 [7]
 Except to the extent that they were incorporated into Part VI of Horace DePodwin's expert report, most of these price comparisons were never objected to and were never excluded under the district court's various evidentiary rulings. See Zenith, supra, 505 F.Supp. at 1320 n. 4. We reversed the district court's evidentiary ruling excluding Part VI of DePodwin's report in our preceding opinion. Slip op. at section V D(1)(b). Thus, all of plaintiffs' model-by-model price comparisons are currently part of this summary judgment record
 
 
 [8]
 Judge Gibbons, for the reasons expressed by him in the opinion in No. 81-2331/32/33, filed simultaneously herewith, would reverse the dismissal against Sony Corporation and Sony Corporation of America as well