WHEELING–PITTSBURGH STEEL
CORPORATION, Plaintiff,

v.

MITSUI & COMPANY,
et al., Defendants.

No. C2–98–1122.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 22, 1999.

Edward Anthony Matto, Bricker & Eckler, Columbus, OH, for plaintiff.

Danny Lee Cvetanovich, Arter & Hadden, Columbus, OH, for defendants.

### OPINION AND ORDER

SARGUS, District Judge.

On November 20, 1998, Plaintiff, Wheeling–Pittsburgh Steel Corporation ("Wheeling–Pitt") filed its First Amended Complaint which sets forth three (3) counts. On December 8, 1998, all defendants, various importers of Japanese and Russian hot-rolled steel, filed a Motion to Dismiss for Failure to State a Claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs.49/50) The Motion is before the Court for disposition. For the reasons that follow, the Motion is granted in part and denied in part.

### I.

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pleaded allegations must be taken as true and be construed most favorably toward the non-movant. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mayer v. Mylod,* 988 F.2d 635, 637 (6th Cir.1993). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, *Lawler v. Marshall,* 898 F.2d 1196, 1199 (6th Cir.1990), the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless there is no law to support the claims made, the facts alleged are insufficient to state a claim, or there is an insurmountable bar on the face of the complaint.

### II.

The defendants first move to dismiss Count I of the First Amended Complaint which alleges a claim under the Antidumping Act of 1916. The defendants assert that Count I does not state a cause of action in that the claim, (1) fails to allege that the defendants sold products below the cost of production with predatory intent, which, according to the defendants' argument, means intent to later gain market control and then recoup dumping losses by raising prices; (2) fails to allege that defendants' sales were priced below an appropriate measure of production and transportation cost; and (3) fails to allege the requisite elements of price discrimination. The Court will address these issues below.

### A. Pleading of Predatory Intent.

The Antidumping Act of 1916 states in its entirety:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided,* That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States. Any person who violates or combines or conspires with any other person to violate this section is guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $5,000, or imprisonment not exceeding one year, or both, in the discretion of the court.

Any person injured in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therefor in the district court of the United States for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee.

The foregoing provisions shall not be construed to deprive the proper State courts of jurisdiction in actions for damages thereunder.

15 U.S.C. § 72.

The statute, in its essence and by its own terms, prohibits the systematic importing of articles of commerce into the United States at a price substantially less than the actual market value or wholesale price in the principal market of the country in which such goods were manufactured, if such importer did so with the intent to do any of the following:

(1) destroy a domestic United States industry;

(2) injure a domestic United States industry;

(3) prevent the establishment of a domestic United States industry;

(4) restrain trade or commerce in the United States; or

(5) monopolize trade and commerce in the United States.

15 U.S.C. § 72. The statute, on its face and in unambiguous terms, prohibits the importation of foreign products, priced below the market value in the principal market of the country in which the goods were produced, if the importer acts with the intent to cause any one of the five deleterious conditions set forth above.

The defendants urge this Court to hold that the Antidumping Act of 1916 also requires that plaintiff show "predatory intent" as the term has been used in the context of interpreting the two major Congressional antitrust enactments prohibiting restraints of trade and unlawful price discrimination. Under both the Sherman Act of 1890, 15 U.S.C. § 1, and the Clayton Act of 1914, as amended in part by the Robinson–Patman Act of 1936, 15 U.S.C. §§ 12 and 13, the Supreme Court has required that a plaintiff alleging unfair competition based upon a competitor's low pricing of a product show that such below-cost-pricing was reasonably intended to drive out competitors, creating subsequent market conditions in which a defendant could raise prices and recoup the losses incurred in the earlier price-cutting. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222–23, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

The defendants assert that the Antidumping Act of 1916 is essentially a law which prohibits only unfair competition and is an extension of the Sherman, Clayton, and Robinson–Patman Acts as to foreign trade. The defendants cite from the rather sparse legislative history from the Congressional Record accompanying the enactment of the Antidumping Act of 1916 which indicates the

sponsors sought not to erect protective tariffs, but to penalize those importers which engaged in unfair trade practices.

██ It is, of course, the role of this Court to apply the statute in accord with the language of the enactment and the intent of Congress. *Moskal v. United States*, 498 U.S. 103, 107–08, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990). As the United States Supreme Court instructs, legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity, but in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive. *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (citations omitted).

██ While the cited legislative history provides some context but little guidance in interpreting the statute, the language set forth in 15 U.S.C. § 72 is the best indicator of Congressional intent. Consistent with the above-summarized legislative history is the simple fact that the statute imposes no tariff or import quotas. The statute does not prevent the importation of foreign products at prices below those charged by domestic producers; only if such low prices are "below market value or wholesale price" in the importer's principal market and set with the intent to destroy, or injure, a domestic industry or to restrain or monopolize trade does the statutory prohibition on dumping come into play. 15 U.S.C. § 72.

The question whether the Antidumping Act of 1916 should be construed to require the same elements of pleading and proof required under the Sherman, Clayton and Robinson–Patman Acts begins with a review of the language of the statutes. The Sherman Act contains in a single sentence the prohibited conduct: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal..." 15 U.S.C. § 1.

The Sherman Act makes no expressed reference to cut-throat pricing, meaning the act of pricing a good below a certain cost of production.[1] Yet, the Act is broad enough to encompass such pricing as anticompetitive and therefore prohibited conduct.

The Clayton Act, as amended by the Robinson–Patman Act, declares:

> It shall be unlawful for any person engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition.[2] ...

15 U.S.C. § 13. The Clayton and Robinson–Patman Acts prohibit a seller of goods from price discrimination as to products of similar grade and quality. The motive of the seller, by the terms of the statute, is inconsequential. If the price discrimination has the effect of lessening competition, on the face of the statute, it is prohibited.

Neither of the Acts specifically addresses the basic questions of whether prices set too low, usually a sign of competition and a benefit for consumers, are prohibited under all circumstances or precisely what type of cut-throat pricing is unlawful. For several decades, the Supreme Court has grappled with this issue. In *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 694, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), the Court held that, under the Clayton Act, a plaintiff alleging primary-line injury (meaning an action brought by a direct competitor against another competitor in the same market) could prevail by showing that a defendant intended to harm competition or produce a declining price structure. Further, while *Utah Pie*

---

1. The Court recognizes the difficulty in ascertaining the "cost of production" or "actual market value or wholesale price" as used in 15 U.S.C. § 15. For purposes of this analysis, the Court is assuming that prices have been set below a price, which under any method of calculation, would allow recovery of the costs of production.

2. The Robinson–Patman Act exempts price discrimination based upon quantities of goods sold or based upon deterioration of perishable goods, distress sales, or seasonal products. 15 U.S.C. § 13.

established under the Clayton Act a relatively low threshold of pleading and proof for an aggrieved plaintiff, the Sherman Act had been interpreted to prohibit cut-throat pricing only when such pricing posed "a dangerous probability of actual monopolization." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 455, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Thus, prior to 1993, the Sherman and Clayton Acts had been interpreted very differently with respect to predatory pricing.

In 1993, the Supreme Court abandoned the distinctions between the two Acts and adopted a unified standard as to the essential legal elements of a claim alleging cut-throat competition under either statute. *Brooke Group Ltd.,* 509 U.S. at 220, 113 S.Ct. 2578. The reasoning of the Court is instructive as to the issue here. The Supreme Court noted:

> The mechanism by which a firm engages in predatory pricing—lower prices—is the same mechanism by which a firm stimulates competition; because cutting prices in order to increase business is the very essence of competition... It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves become a tool for keeping prices high.

*Id.* at 226–27, 113 S.Ct. 2578.

The Court thereupon established that in any action brought under either the Sherman, Clayton, or Robinson–Patman Acts which alleges predatory, cut-throat pricing, a primary-line plaintiff must show "that the prices complained of are below an appropriate measure of its rival's costs." *Id.* at 222, 113 S.Ct. 2578. The plaintiff must also show that the defendant "had a reasonable prospect ... of recouping its investment in below-cost prices." *Id.* at 224, 113 S.Ct. 2578. In other words, the defendant must be shown to have expected that the cut-throat prices would reasonably lead to its market dominance, to the point that it could later raise prices and recoup its losses incurred by selling at a predatory price.

■ The *Brooke Group* decision plainly views low prices as presumptively beneficial to both competition and consumers. Only if a predatory intent, including reasonable prospects of market dominance and recoupment can be shown, is cut-throat pricing unlawful under the Sherman, Clayton, or Robinson–Patman Acts.

The defendants herein urge the Court to hold that the Antidumping Act of 1916 requires the complaining party to plead the same allegation of predatory intent together with reasonable prospects of market dominance and recoupment of losses. In addition to the legislative history summarized above, the defendants assert that the same anticompetitive behavior prohibited in the domestic economy by the Sherman, Clayton or Robinson–Patman Acts should be the only conduct prohibited in the Antidumping Act of 1916.

■ The Court rejects this argument for a number of reasons. Initially, there is no requirement under the Constitution or elsewhere, that Congress impose the same standards of conduct on the importers of goods as it does on domestic producers of goods. From time to time in our history, national policy has included aspects of both free trade and protectionism. (Compare the Smoot–Hawley Tariff of 1930 to the recently approved North American Free Trade Agreement ("NAFTA")). The establishment of trade policy is a matter committed to the President and Congress and is expressed in treaties and statutes required to be enforced by this Court.

■ The Court first notes that the three domestic statutes share a similarity with the Antidumping Act of 1916. All of the statutes prohibit, under circumscribed conditions, predatory pricing that is below the cost of production. Because, however, the domestic statutes provide no guidance as to precisely when low prices, the traditional method of healthy competition, are anticompetitive, the Supreme Court has required not just proof of predatory pricing (meaning simply below cost pricing with a goal of increasing market share), but additional proof of probable subsequent market dominance and price recoupment. In this Court's view, the additional need to prove subsequent market dominance and price recoupment was imposed by the Supreme Court to distinguish aggressive but competitive price cutting (assumed to be

good for competition and consumers) from predatory, anti-competitive price cutting (assumed to be ultimately bad for consumers and competition). The absence of such provisions in the domestic statutes required the imposition of these additional elements of proof or else the primary goals of the statutes to promote competition would be destroyed.

The absence of such provisions in the domestic antitrust statutes is simply not paralleled in the Antidumping Act of 1916. In addition to requiring a plaintiff to plead and prove discriminatorily low prices, the plaintiff must also plead and prove that a defendant set such a price with discriminatory intent to injure, destroy or prevent the creation of, a domestic industry or to restrain or monopolize commerce in the United States.

Wheeling–Pitt has alleged that, in addition to selling hot-rolled steel at prices below actual market value or wholesale prices in their own primary markets, the defendants acted with intent to destroy the hot-rolled steel industry (First Amended Complaint, ¶¶ 18, 19, 22). As the Antidumping Act requires, Wheeling–Pitt has not merely alleged that the defendants simply engaged in cutthroat pricing. Instead, the First Amended Complaint tracks the statute by claiming that the dumped steel was priced below "market value or wholesale price" in the producers' principal market *and* that the defendants did so with the intent to injure the domestic hot-rolled steel industry.

■ To this extent, the Antidumping Act of 1916 contains that which the domestic antitrust statutes do not—an additional element of proof beyond simply proving that prices were set below product cost or market value. Further, this additional element of requiring injury to or destruction of a domestic industry was added by Congress itself, thereby negating any need for interstitial jurisprudence on behalf of the federal courts. In sum, the Antidumping Act of 1916 does not, as do the domestic antitrust statutes, in the absence of a judicially engrafted predatory intent requirement, proscribe low, competitive prices standing alone. These practices are prohibited only if such prices are set with the intent to injure, destroy, or prevent the

establishment of a domestic industry. 15 U.S.C. § 72.

■ The Antidumping Act creates a cause of action by a showing that a defendant set prices below a prohibited level with the intent to cause one or more of the five harms described in the statute. Wheeling–Pitt has pleaded two of the five, by alleging that the defendants acted to (1) destroy or (2) injure the domestic hot-rolled steel industry. The third harm set forth in the statute—preventing the establishment of a domestic industry—is inapplicable.

To be sure, the fourth and fifth types of harm described in the Antidumping Act of 1916 have similarities to the Sherman, Clayton, and Robinson–Patman Acts. A showing may be made under 15 U.S.C. § 72 that the defendants acted with the intent to restrain or monopolize trade or commerce. Neither of these two grounds, however, was pleaded by Wheeling–Pitt in the First Amended Complaint. It may well be that the analysis used in *Brooke Group*, should apply to claims based solely on alleged intent to restrain or monopolize trade and the additional showing of reasonable prospects of market dominance and subsequent price recoupment. Resolution of this issue, which is not before the Court, must wait for a more appropriate case.

The Court finds that, under 15 U.S.C. § 72, as pleaded by the plaintiff, Wheeling–Pitt must show that the defendants sold their product at a price level prohibited by the statute with the intent to injure or destroy the domestic hot-rolled steel industry. The additional proof of "predatory pricing" as the term is used in *Brooke Group* is not applicable to this case. The Court further notes that the term "predatory pricing" is used to distinguish anti-competitive, unlawful pricing from pro-competitive, pro-consumer price competition. There are more ways than one, however, for a competitor to engage in predatory pricing tactics. Under the domestic antitrust statutes, "predatory pricing," after *Brooke Group*, means below-cost pricing established with the reasonable expectation that, through later acquired market share,

recovery of the cost incurred by the earlier lower prices will occur.

██ Under the Antidumping Act of 1916, as pleaded herein, "predatory pricing" means something different. The artificially low prices must be set with the goal of injuring, destroying, or preventing the establishment of an American industry. It is certainly within the purview of Congress to distinguish harm caused by domestic competitors from those caused by international ones. For example, dumping itself has long been noted to constitute a harmful international trade practice which may, through *government,* as opposed to market-driven action, cause sharp increases in imported goods, to the detriment of domestic producers. Note, *Rethinking the Antidumping Act of 1916,* 110 Harv. L.R. 1555 (1997).

This distinction, in addition to the clear language of the statute, renders the "predatory pricing" element of proof as defined in *Brooke Group* inapplicable to dumping cases. The whole premise of *Brooke Group,* as applied to domestic competition, is that low prices are the healthy, driving mechanism of fair competition and that the only truly exceptional cases alleging antitrust-type harm may be based on a claim of artificially low prices. This premise is lacking in the context of international trade, which is frequently conducted by companies owned, controlled, or subsidized by foreign governments. A foreign government may decide that it is more beneficial for one or more industries to increase both international and U.S. market shares and to continue to manufacture products, provide employment to its citizens, recoup government investment in what might be an otherwise idle plant, receive hard currency from the sale of exports, or simply protect powerful local economic interests, even though products are sold at a loss.

To apply the holding of *Brooke Group* to an international dumping action would, in addition to ignoring the language of 15 U.S.C. § 72, assume that international trade competition is no different than domestic competition. During the Congressional debate preceding the enactment of the Antidumping Act of 1916, members of Congress took note of the fact that the legislation would protect the country from not only "foreign trusts, syndicates, and combinations" but from foreign companies owned or subsidized by foreign governments. 53 Cong. Rec. 13,080 (daily ed. Aug. 24, 1916) (statement of Sen. Penrose.)[3] It is clear from the Congressional record that Congress understood the difference in pricing motivation of foreign subsidized firms compared to those in the domestic arena.

The case law, limited as it is, supports this conclusion. The case most directly on point is *Geneva Steel Co. v. Ranger Steel Supply Corp.,* 980 F.Supp. 1209 (D.Utah 1997). Arguments similar to those raised herein by defendants were also raised in the *Geneva Steel* case. The defendants urged the Court to construe the Antidumping Act of 1916 as an antitrust statute therefore requiring the plaintiff to prove the type of predatory intent required of antitrust plaintiffs following the *Brooke Group* decision.

In this Court's view, the conclusion reached by the district court in *Geneva Steel* was correct. The Court held that the Antidumping Act of 1916 did not require the type of predatory intent defined in *Brooke Group,* because the statute "has a protectionist reach beyond anti-trust and traditional predatory price-discrimination pleading requirements." *Geneva Steel,* 980 F.Supp. at 1217. The court emphasized that a plaintiff must still plead and prove intent to injure a domestic industry by selling at artificially low prices. This Court notes that the decision in *Geneva Steel* limits the term "predatory intent" to the definition given in *Brooke Group.* While this decision is in accord with the *Geneva Steel* holding, this Court is of the view that, by requiring a plaintiff to prove "intent to injure a domestic injury" by below-cost-pricing, the Antidumping Act of 1916 does require proof of predatory intent, albeit of a different kind.

---

**3.** While Senator Penrose urged stronger, protectionist measures as well, he spoke in favor of the legislation.

This distinction is of some significance in consideration of the only other case directly addressing the issue. In the case of *Zenith Radio Corp. v. Matsushita Elec. Indus. Co. Ltd.*, 494 F.Supp. 1190 (E.D.Pa.1980), the district court relied on its review of the legislative history accompanying the Antidumping Act of 1916 in concluding that the statute was meant to be part and parcel of the domestic antitrust laws and designed to simply apply the Sherman and Clayton Acts to foreign competitors. The court concluded that "... we should not interpret the 1916 Act to impose on importers legal strictures which are more rigorous than those applied to domestic enterprises." *Id.* at 1223.

With due regard for the diligent and scholarly efforts of the district court in *Zenith Radio*, this Court disagrees with its logic for several reasons. First, Congress, if it so intended, could have extended the scope and coverage of the Sherman and Clayton Acts to international dumping by simply stating the same. Instead, the Antidumping Act of 1916 imposes elements of proof nowhere to be found in domestic antitrust statutes, requiring proof of intent to use cut-throat prices to injure, destroy, or prevent the establishment of, a domestic injury.[4]

Moreover, the method of interpretation selected by the court in *Zenith Radio* would not, in fact, harmonize domestic antitrust statutes with the Antidumping Act of 1916. While decrying any interpretation which would "impose on importers" standards "more rigorous than those applied to domestic enterprises," the holding ignores the clear language of the statute and imposes on domestic manufacturer's claiming injury due to unlawful dumping the burden of proving *both:* (a) antitrust type of predatory pricing, including the reasonable prospect of resultant market control and price recoupment, together with (b) the intent of a defendant to injure, destroy, or prevent the establishment of a domestic injury.

Rather than equalizing the burden of proof to be met by plaintiffs claiming antitrust injury and dumping injury, the district court's decision simply doubles the burden faced by a plaintiff bringing action under the Antidumping Act of 1916. No provision of 15 U.S.C. § 72 states or even implies that Congress intended such a result. In *Geneva Steel*, the district court described the conclusion reached in *Zenith Radio* as an effort "by the judicial branch [to] rewrit[e] the statute and thereby inappropriately invad[e] the terrain of the legislative branch." *Geneva Steel*, 980 F.Supp. at 1219.[5]

No other reported cases have addressed the issue before the Court. Contrary to the assertion of defendants, the case of *USX Corp. v. United States*, 682 F.Supp. 60 (CIT 1988), actually supports the position of the plaintiff. While not addressing the issue of proof relating to predatory pricing, the court noted that the "injury to industry" standard

4. The Court again notes that the statute also permits, as an alternate method of proof, a plaintiff to show that "cut-throat pricing" of imported goods was intended to restrain or monopolize trade. This Court, as mentioned above, excludes from its analysis the question of whether the holding in *Brooke Group* should extend to these alternative methods permitted under the statute, methods of proof not at issue in this case.

5. The *Zenith Radio* case spawned a large number of reported cases. The decision of the district court cited herein was subsequently reversed on other grounds in the case of *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 319 (3rd Cir.1983), although the appellate court did order that the antidumping claim be reinstated. Thereafter, the Supreme Court, without addressing any issue relating to the Antidumping Act of 1916, reversed the decision of the Court of Appeals. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On remand, the Court of Appeals reversed course and dismissed the antidumping claims. Contrary to the assertions of defendants herein, the Third Circuit, having previously found that an anticompetitive conspiracy under the Sherman Act established a violation of 15 U.S.C. § 72, reversed its position when the Supreme Court overruled its Sherman Act analysis. The second decision of the Court of Appeals, *In re Japanese Electronic Products Antitrust Litigation*, 807 F.2d 44 (3rd Cir.1986) has no analysis of the issue before this Court. The court did note that there was no evidence to support an antidumping claim requiring the plaintiffs to show that "the defendants ... dumped consumer electronic products with the required intent to injure or destroy a United States industry." 807 F.2d at 49. No other type of predatory intent was referenced as a requirement of a valid antidumping claim; the decision of the Third Circuit is of no aid to the defendants' position.

set forth in the Antidumping Act of 1916 focused not on "injury to competition," but rather on the conditions of a domestic industry. This view emphasizes the distinction between the domestic antitrust and the internally focused antidumping statutes. While the Sherman, Clayton, and Robinson–Patman Acts expressly protect competition, the language of the Antidumping Act of 1916 seeks to prevent "injury to industry" from cut-throat pricing by international manufacturers.

For these reasons, defendants' assertion that Wheeling–Pitt has failed to allege predatory pricing by which the defendants could reasonably gain market dominance and subsequently raise prices to recoup losses incurred by selling at a cut-throat price is without merit. This portion of the Motion to Dismiss accordingly is DENIED.

### B. *Pleading of Unlawful Pricing and Discriminatory Conduct*

The defendants also claim that the plaintiff has failed to allege with particularity that the offending price is below an appropriate measure of cost. The defendants are the importers, not the manufacturers, of hot-rolled steel. The defendants claim that the plaintiff must allege that the price charged is less than the price the defendants paid for the product at the time of purchase from foreign steel manufacturers.

The First Amended Complaint specifically alleges that the defendants have offered and sold hot-rolled steel imported from Japan and Russia at prices substantially less than the actual market value or wholesale prices of that type of steel in Japan and Russia, where it is commonly sold, after adding freight, import charges, and other expenses. (First Amended Complaint, ¶ 18, 19, 20, 28–30). The pleading encompasses the harm set forth in the statute. No case has been cited to the Court requiring the plaintiff to plead further. At a later point in this proceeding, following discovery, determining the definition of "actual market value" or "wholesale prices" will no doubt be problematic, but not

a matter of pleading. Resolution of these issues at this juncture is premature.

Finally, the Court notes that 15 U.S.C. § 72 prohibits dumping by "any person importing or assisting in importing ..." Neither party has addressed in detail the issue of cut-throat pricing by an importer, rather than a manufacturer. At this juncture, the Court will not address the burden plaintiff faces as to an importer, such issue being less than adequately developed in the briefing.

### III.

The defendants also move to dismiss Counts II and III of the First Amended Complaint which set forth claims under Ohio law for alleged unfair competition and tortious interference with contracts. Plaintiff previously set forth virtually identical claims in the original Complaint filed in this case.[6] The original Complaint was filed in the Belmont County, Ohio Court of Common Pleas, and removed to this Court by the defendants. After removal, the plaintiff moved to remand the case to state court, while the defendants moved for an order from this Court dismissing the Complaint.

In a decision entered on November 16, 1998, this Court determined that the state claims set forth in Counts I and II of the original Complaint, and now basically set forth as Counts II and III in the First Amended Complaint, were completely preempted by federal law. This Court also provisionally denied the defendants' Motion to Dismiss, since the Complaint also set forth allegations which, if re-pleaded, could constitute a claim under federal law, specifically the Antidumping Act of 1916, 15 U.S.C. § 72. The Court permitted the plaintiff to amend its Complaint to allege specifically a claim under the federal statute.

Count I of the First Amended Complaint does in fact assert a claim under 15 U.S.C. § 72, the sufficiency of which has also been challenged by defendants in their Motion to Dismiss, as analyzed above. Counts II and III, however, simply restate the same state

---

**6.** While the defendants named in the initial Complaint are not identical to the defendants named in the First Amended Complaint, the partial

change of parties does not alter the legal issue before the Court.

law claims which this Court already has determined to be completely preempted, and therefore failing to state a claim upon which relief may be granted.

Wheeling–Pitt claims that the Antidumping Act of 1916 was not intended to preempt state law claims. In making this argument, Wheeling–Pitt relies heavily upon that portion of the 1916 Act which provides that, "[t]he foregoing provisions shall not be construed to deprive the proper state courts of jurisdiction on actions for damages thereunder." 15 U.S.C. § 72. In its previous decision, however, this Court has already addressed and rejected the same argument.

 The federal statute, as with the great majority of statutorily created federal causes of action, may be asserted in claims brought in state court. In such case, federal law, though, provides the controlling legal standards. Further, such claims, when brought in state court, may be removed to the federal court system under 28 U.S.C. § 1441, which is what has occurred in this case. Finally, for reasons set forth more fully in the Court's decision of November 16, 1998, issues of foreign trade are matters completely preempted by federal law. By analogy, pension disputes arising under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* may be brought in state court, notwithstanding the fact that federal law has preempted the entire field. Federal law provides the legal standards for such claims and defendants may remove such cases to federal court. To the extent they effect a right under ERISA, state law claims are completely preempted. Because matters of foreign trade are exclusively federal, state law claims are completely preempted in a manner similar to state law claims relating to any employee benefit plan. 29 U.S.C. § 1144(a).

Based upon the foregoing, the defendants' Motion to Dismiss Counts II and III of the first Amended Complaint is well taken. The Court finds that both counts fail to state claims upon which relief may be granted. It is therefore ORDERED that Counts II and III are dismissed.

## IV.

For these reasons, Defendants' Motion to Dismiss is **DENIED IN PART** and **GRANTED IN PART.** (Doc. 50) The Court **DENIES** defendants' Motion to Dismiss Count I of the First Amended Complaint and **GRANTS** defendants' Motion to Dismiss Counts Counts II and III of the First Amended Complaint. Counts II and III of the First Amended Complaint are, hereby, **DISMISSED.**

**IT IS SO ORDERED.**