**GOSS INTERNATIONAL CORPORATION, a Delaware corporation, Plaintiff,**

v.

**TOKYO KIKAI SEISAKUSHO, LTD., a Japanese corporation and TKS (U.S.A.), Inc., a Delaware corporation, Defendants.**

No. 00–35 LRR.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Nov. 25, 2003.

Bradley P. Nelson, Ian H. Fisher, Jose
A. Lopez, Mary Beth Wynn–Smith, Steven

A. Weiss, Schopf & Weiss, William G. Schopf, Chicago, IL, Patrick M. Roby, Robert M. Hogg, Elderkin Law Firm, Cedar Rapids, IA., for Plaintiff.

Barry J. Reingold, Perkins, Coie, LLP, Washington, DC, Nicholas V. Critelli, Jr., Nicholas (Tre) Critelli, III, Nicholas Critelli Assoc., Des Moines, IA., for Defendants.

## ORDER SUPPLEMENTING NOVEMBER 13, 2003 RULING ON MOTIONS FOR SUMMARY JUDGMENT

READE, District Judge.

### TABLE OF CONTENTS

I.  INTRODUCTION .................................................1029
    A.  Procedural Background ...............................1029
    B.  Factual Background ..................................1030

II. GOSS'S MOTION FOR SUMMARY JUDGMENT ON TKS'S
    AFFIRMATIVE DEFENSES .......................................1032
    A.  Summary Judgment Standard ...........................1032
    B.  Goss's Arguments for Summary Judgment on TKS's Affirmative
        Defenses ............................................1033
    C.  Analysis of Goss's Motion for Summary Judgment .......1033

III. TKS'S MOTION FOR SUMMARY JUDGMENT ...........................1033
    A.  The Antidumping Act of 1916 .........................1033
    B.  Comparability of LNPPs Under the 1916 Act ...........1034
        1.  TKS's Arguments that Products Must Be Identical to be Comparable
            Under the 1916 Act ..............................1034
        2.  Goss's Arguments In Opposition to the Requirement that Products be
            Identical to be Considered Comparable Under the 1916 Act ..........1034
        3.  The Legislative History of the 1916 Act .........1034
        4.  Standard of Comparability of Products Required Under the 1916 Act....1037
    C.  Whether "Actual Market Value or Wholesale Price" As Used in the 1916
        Act is Limited to Wholesale Price or Sales at Wholesale .................1039
    D.  Whether TKS's Sales of LNPPs in the United States were "Common and
        Systematic" for Purposes of the 1916 Act.............1041
    E.  Did TKS Sell and Import Its LNPPs in the United States With the
        Intent to Cause Competitive Injury to Goss Rather than Simply to Win
        or to Retain Specific Customers? ....................1041
    F.  Did TKS's Pricing Cause Destructive—or Any—Injury to Goss
        Cognizable Under the 1916 Act? ......................1043

IV. CONCLUSION....................................................1044

### I. INTRODUCTION

#### A. Procedural Background

Plaintiff Goss International Corporation ("Goss"), successor to the assets and business of Goss Graphic Systems, Inc., brought this action in May, 2000 alleging claims against Defendants Tokyo Kikai Seisakusho, Ltd., and TKS (U.S.A.), Inc. (collectively "TKS") under the Antidumping Act of 1916, 15 U.S.C. § 72 (the "1916 Act"). Goss alleges in its Complaint that "[f]or years [TKS] has offered and sold Newspaper Presses and Newspaper Press additions in the United States at prices substantially less than their actual market value in other countries, after adding freight, tariffs and other charges and expenses. [TKS has] undertaken this conduct—called 'dumping'—in a deliberate effort to destroy or injure the United States Newspaper Press Industry."

This matter is before the Court pursuant to Goss's October 15, 2003 Motion for Summary Judgment on Defendants' Affirmative Defenses (docket no. 340) and to TKS's October 15, 2003 Motion for Summary Judgment on Goss's claims under the 1916 Act (docket no. 343). On November 6, 2003, TKS filed a partial resistance to Goss's Motion and Goss resisted TKS's Motion. On November 13, 2003, the Court issued an Order holding: (1) Goss's Motion for Summary Judgment on TKS's Affirmative Defenses was granted in part and denied in part; and (2) TKS's Motion for Summary Judgment on Goss's 1916 Act claims was denied. This Order sets forth the Court's reasons for its November 13, 2003 ruling.

## B. Factual Background

The following facts are undisputed. Goss Graphic Systems, Inc. was a manufacturer and supplier of newspaper presses, newspaper press additions and other printing press systems for the newspaper, advertising and commercial printing and publishing markets. Goss is the successor to the business and assets of Goss Graphic Systems, Inc. Tokyo Kikai Seisakusho, Ltd., is a Japanese corporation with its principal place of business in Tokyo, Japan which manufactures newspaper presses and newspaper press additions and distributes such products in Japan, the United States and other countries through its subsidiaries. TKS (U.S.A.), Inc., is a Delaware corporation with its principal place of business in Richardson, Texas which imports, markets and sells in the United States newspaper presses and newspaper press additions manufactured by Tokyo Kikai Seisakusho, Ltd.

Large newspaper printing presses ("LNPP") such as those manufactured and sold by TKS and Goss consist of five discrete components: a printing unit, a reel tension paster ("RTP"), a folder, conveyance and access apparatus, and a computerized control system. A printing unit is any component that prints in monocolor, spot color and/or process (full) color or a printing unit cylinder. A RTP is any component that feeds a roll of paper more than two newspaper broadsheet pages in width into a subject printing unit. A folder is any module or combination of modules capable of cutting, folding, and/or delivering the paper from a roll or rolls of newspaper broadsheet paper more than two pages in width into a newspaper format. A conveyance and access apparatus is any equipment capable of manipulating a roll of paper more than two newspaper broadsheet pages across through the production process and which provides structural support and access. A computerized control system is any computer equipment and/or software designed specifically to control, monitor, adjust and coordinate the functions and operations of large newspaper printing presses or press components. LNPPs are custom ordered machines. Once a newspaper publisher orders a LNPP, it takes one to two years to build and install a LNPP. Installation of a LNPP may take eight months or more. Installation is not considered complete until the equipment in operation meets the performance specifications incorporated in the contract. LNPP systems typically cost from $10 million to over $100 million for multiple press lines.

LNPPs used in Japan differ in some respects from those used in the United States and newspapers printed in Japan differ to a certain degree from those printed in the United States.[1] For example,

---

1. While there is no dispute between the parties with respect to whether LNPPs manufactured for use in Japan differ from those manufactured for use in the United States, Goss and TKS dispute the type of and the significance of such differences.

Japanese newspapers are folded to open in a "left to right" direction.

No folder manufactured by any LNPP producer and designed for use in Japan ever has been incorporated into a United States press line. Shell plate cylinders permit press crews to make registration adjustment to any four newspaper page size plate in both circumference and lateral directions of the plate cylinder without disturbing the other plate on the same cylinder during color printing. In the 1990's TKS offered shell cylinders to a few United States publishers as an option and at an additional cost per 4x4 tower printing unit over and above the price of one-piece cylinders. No United States publishers purchased the option. No United States publisher ever has purchased a press with shell cylinders from any LNPP manufacturer. TKS has offered for sale since 1998 tower printing units that incorporate rubber rollers the core of which is made of carbon-reinforced plastics. Some Japanese publishers have purchased TKS's tower printing units that incorporate the rubber rollers. However, none of the tower printing units TKS sold to United States publishers incorporate such rubber rollers. Japanese newspaper publishers usually use high viscosity petroleum based inks, while United States publishers use, as a general rule, lighter soy-based inks. No computer control unit designed for use in Japan by any manufacturer of LNPPs ever has been incorporated into a United States press line. No United States publisher ever has purchased new or used equipment designed for use in Japan and attempted to incorporate it into a United States press line. Similarly, no Japanese publisher ever has purchased new or used equipment designed for use in the United States and attempted to incorporate such equipment into a Japanese press line.

During the 1960's and 1970's, Goss had 70% or more of the installed base[2] for LNPPs. As of 1991, Goss had an installed base of 70% of approximately 630 newspaper plants. TKS entered the United States market in 1976 and, as of 1991, TKS had an installed base of approximately 3% of the newspaper customers. For the years 1991 through 2000, the following represents the annual total sales of LNPP equipment in the United States:

| | | |
|---|---|---|
| 1991 | | $138,400,000 |
| 1992 | | $136,500,000 |
| 1993 | | $122,500,000 |
| 1994 | 1 | $262,300,000 |
| 1995 | | $313,600,000 |
| 1996 | | $ 88,000,000 |
| 1997 | | $152,000,000 |
| 1998 | | $318,800,000 |
| 1999 | | $247,250,000 |
| 2000 | | $ 74,000,000 |

Between 1992 and 2000, Goss made sales to 39 publishers in the United States. Between 1991 and 2000, Goss won 42 contracts with 39 customers and had total sales of LNPP equipment in the United States of:

| | |
|---|---|
| 1991 | $102,800,000 |
| 1992 | $ 88,000,000 |
| 1993 | $ 62,000,000 |
| 1994 | $175,500,000 |
| 1995 | $ 85,000,000 |
| 1996 | $ 47,000,000 |
| 1997 | $ 86,000,000 |
| 1998 | $183,800,000 |
| 1999 | $ 13,250,000 |
| 2000 | $          0 |

During the time period from 1991 to 2000, all of TKS's sales, except the 1994 sale to the Spokane Spokesman Review, were sales of additions to existing TKS customers. TKS made sales to the Dallas Morning News in years 1992, 1993, 1994 and 1996, to Dow Jones in 1994 and 1999,

---

**2.** The term "installed base" as used in this case refers to the number of newspaper publishers in the United States to which a given LNPP manufacturer has made the original sale of the main LNPP unit.

to the Columbus Dispatch in 1998 and to the Atlanta Journal and Constitution in 2000.

During the time period from 1995 to 2000, Goss won 21 contracts with 21 customers. During the same time period, TKS won only four contracts—the Dallas Morning News, Dow Jones, Columbus Dispatch and Atlanta Journal and Constitution contracts. Goss did not submit proposals for the Columbus Dispatch or the Atlanta Journal and Constitution contracts.

Dow Jones has 19 LNPPs at 17 plants in the United States. TKS presses are installed in nine of those press lines while Goss presses are installed on the other ten. Dow Jones asked that TKS and Goss submit proposals to provide color printing units as add-ons to the LNPPs each company previously had sold to Dow Jones. Dow Jones also asked TKS and Goss each to submit proposals to add color units as add-ons to presses previously provided by the other. Dow Jones chose to purchase from TKS the add-ons for the presses Dow Jones previously had purchased from TKS. Many factors influenced this decision. Dow Jones had concerns about technical issues likely to arise if it awarded to Goss a contract to integrate Goss color towers with TKS printing units. Goss had integrated Goss color towers with TKS printing units on only one prior occasion.

As of 1991, there were five LNPP producers competing in the United States market. Goss, Man Roland (a German producer), Koenig & Bauer Aktiengelleschaft (a German producer), Mitsubishi Heavy Industries, Ltd. (a Japanese producer) and Wifag (a Swiss producer). Newspaper publishers typically require one or more of these competing LNPP manufacturers to enter into competitive bidding for a contract and use the bids of one LNPP supplier to force down the prices of its competitors.

## II. GOSS'S MOTION FOR SUMMARY JUDGMENT ON TKS'S AFFIRMATIVE DEFENSES

### A. Summary Judgment Standard

Summary judgment is appropriate only when the record, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Carter v. Ford Motor Co.,* 121 F.3d 1146, 1148 (8th Cir.1997) (citing *Yowell v. Combs,* 89 F.3d 542, 544 (8th Cir.1996)). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999). In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus.,* 475 U.S. at 587, 106 S.Ct. 1348. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id.*

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 394 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party successfully has carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue

for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### B. Goss's Arguments for Summary Judgment on TKS's Affirmative Defenses

TKS asserts the following affirmative defenses to Goss's 1916 Act claims: (1) Goss's claims are barred by the applicable statute of limitations; (2) Goss failed to mitigate its damages; (3) the 1916 Act contravenes international obligations; (4) the 1916 Act is unconstitutionally vague; (5) Goss's alleged damages are caused by acts or omissions over which TKS had no control; (6) Goss's alleged damages were caused by its own acts or omissions; and (7) Goss's alleged damages are speculative. Goss moves for summary judgment on the second through seventh affirmative defenses set forth above. TKS filed a response and a partial resistance to Goss's Motion in which TKS agreed to withdraw affirmative defenses two, three and four and resisted Goss's Motion with respect to affirmative defenses five, six and seven.

Goss moves for summary judgment with respect to TKS's affirmative defenses five, six and seven on the following grounds: (1) TKS fails to allege a single fact in support of any of these defenses; (2) these defenses are mere legal conclusions and are not properly alleged; and (3) TKS cannot meet its burden of proof with respect to any of these defenses.

### C. Analysis of Goss's Motion for Summary Judgment

The Court's examination of the evidence produced by TKS in opposition to Goss's Motion for Summary Judgment on each of these affirmative defenses leads the Court to conclude that there is a genuine issue of material fact with respect to the applicability of such affirmative defenses. The issue of whether TKS's sale of LNPPs in this case at allegedly dumped prices is the proximate cause of Goss's damages and the issue of whether the damages Goss has alleged in this case are speculative are issues which are best resolved at trial. Accordingly, the Court declines to grant summary judgment with respect to these affirmative defenses.

### III. TKS'S MOTION FOR SUMMARY JUDGMENT

#### A. The Antidumping Act of 1916

The 1916 Act provides in pertinent part:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty and other charges and expenses necessarily incident to the importation and sale thereof in the United States: Provided, That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States or of restraining or monopolizing any part of

the trade and commerce in such articles in the United States. . . .

15 U.S.C. § 72.

### B. Comparability of LNPPs Under the 1916 Act

### 1. TKS's Arguments that Products Must Be Identical to be Comparable Under the 1916 Act

The 1916 Act requires that the prices of products imported or sold in the United States be compared to the "actual market value or wholesale price of such articles" sold in the principal markets of the country of their production or in another foreign country to which they commonly are sold. TKS's first argument in support of its Motion for Summary Judgment is that the term "such articles" as used in the 1916 Act requires that the articles sold in the United States be identical to those sold in the home market. In support of this proposition, TKS notes that the 1916 Act does not define the degree of similarity required thereunder and the Court must therefore look to the definition of the term "such" provided by Paragraph R of the 1913 Tariff Act and the appraisement case law arising from the 1913 Tariff Act. TKS posits the word "such" as used in appraisement statutes, including Paragraph R of the 1913 Tariff Act, has been held to mean "identical" and not "similar" because the appraisement statutes use the language "such or similar" to specify which articles may be considered by the customs appraiser in his determination of value. If "such" were to mean "similar" under these statutes, TKS contends, the word would be mere surplusage. TKS thus asserts that because: (a) all TKS LNPPs are custom-designed according to customer specifications; and (b) TKS's LNPPs designed and made for the United States market are not identical to those made for use in Japan, there is no jury issue with respect to whether TKS violated the 1916 Act in this case.

TKS further contends that even if the term "such articles" as used in the 1916 Act does not require the comparison of identical products, the customs appraisement laws in place at the time the 1916 Act was enacted mandate that such products be "commercially interchangeable." The "commercially interchangeable" standard, TKS urges, "requires proof that a merchant could buy a product in the foreign market and find a ready commercial market for its sale in the United States." TKS maintains that the LNPPs manufactured for the Japanese market in this case have no commercial market in the United States and therefore the LNPPs manufactured for use in Japan are not "commercially interchangeable" with the LNPPs manufactured for use in the United States.

### 2. Goss's Arguments In Opposition to the Requirement that Products be Identical to be Considered Comparable Under the 1916 Act

Goss maintains in response that the 1916 Act makes it illegal to sell articles in the United States at prices substantially below the actual market value or wholesale price for "such articles" in the producer's home market and interpretation of the term "such articles" to mean that "identical articles" is without precedent. Instead, Goss urges, the term "such articles" as used in the 1916 Act allows for price comparison to "similar" merchandise and the test for determining similarity for purposes of the 1916 Act is whether the products in the two markets are "comparable."

### 3. The Legislative History of the 1916 Act

The determination of whether a party has engaged in dumping in violation of the 1916 Act requires a comparison between the price of the products sold in the United States and "the actual market value or wholesale price" of such products sold in the principal markets of the exporting

country. The 1916 Act is silent, however, on the standard courts are to use when making such a comparison. Because the plain language of the 1916 Act does not address the standard of comparability required thereunder, the Court must look to the legislative purpose behind the 1916 Act. *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (" 'Where . . . the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.' ") (quoting *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *Arkansas Med. Soc., Inc. v. Reynolds,* 6 F.3d 519, 527 (8th Cir.1993) ("To resolve an ambiguous statute, courts may examine legislative history.") (citing *Toibb v. Radloff,* 501 U.S. at 162, 111 S.Ct. 2197).

Congress enacted the 1916 Act as section 801 of the Revenue Act of 1916 (the "Revenue Act"), which was introduced on July 1, 1916 and presented to and approved by President Wilson on September 8, 1916. 53 Cong.Rec. 14157 (1916). Congress sought in the Revenue Act to offset the cost of "military preparedness related to the European war and skirmishes on the Mexican border, and to finance a projected federal deficit of more than $200 million for the fiscal year ending June 30, 1917." *Zenith Radio Corporation v. Matsushita Electric Industrial Co.,* 494 F.Supp. 1190, 1220–21 (E.D.Pa.1980) (citing H.R.Rep. No. 922, 64th Cong., 1st Sess. 1–2 (1916); S.Rep. No. 793, 64th Cong., 1st Sess.1–2 (1916)), *aff'd in part, rev'd in part and remanded by In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 319 (3rd Cir.1983). The 1916 Act was one of five provisions included in the Revenue Act under "Title VIII Unfair Competi-

tion." *Id.* at 1221. The House Report includes the following discussion of the 1916 Act:

> In order that persons, partnerships, corporations, and associations in foreign countries, whose goods are sold in this country may be placed in the same position as our manufacturers with reference to unfair competition, your committee recommends:
>
> (1) The adoption of a provision making it unlawful for a person, partnership, corporation, or association to import and systematically sell any article at a price substantially less than the actual market value or wholesale price of such article at the time of exportation, with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States; . . .

H.R.Rep. No. 922, *supra,* at 9–10 (as quoted in *Zenith Radio Corporation,* 494 F.Supp. at 1221). There was no discussion of the antidumping clause of the Revenue Act in the Senate Report. *Zenith Radio Corporation,* 494 F.Supp. at 1221. The Congressional debate regarding the Revenue Act included very little discussion of the antidumping clause and Congress did not specifically address in such discussions the issue of the requisite degree of comparability of articles sold in the United States with articles sold in foreign countries. *Id.*

The floor debates that did address the antidumping clause indicate the reason for including such clause in the Revenue Act was "widespread fear of unfair competition from European manufacturers after the end of hostilities" associated with World War I [3]. *Id.* Both the Democratic and the

---

**3.** The court in *Zenith Radio Corporation,* 494      F.Supp. at 1221–22, cited the following re-

Republican members of Congress shared these sentiments. *Id.* (citing 53 Cong.Rec. 10531 (1916) (statement of Representative Longworth, R–Ohio); 53 Cong.Rec.App. 1398 (statement of Representative Keating, D–Colorado)). During the debate on the Revenue Act, the Democratic majority focused on the need for lowered tariffs and attacked the Republican members of the legislature for their continued advocacy of the need for protectionism. *Id.* (citing 53 Cong.Rec. 10525 (statement of Representative McGillicuddy, D–Maine); 53 Cong.Rec. 10596 (statement of Representative Dixon, D–Indiana); 53 Cong.Rec. 13045 (statement of Senator Underwood, D–Alabama)).

The sponsor of the Revenue Act, Representative Kitchen, explained to the members of the House of Representatives prior to its consideration of the bill that the antidumping provisions were intended to apply to foreign import traders the same unfair competition law which applied at the time to domestic traders. *Zenith Radio Corporation,* 494 F.Supp. at 1221 (citing 53 Cong.Rec.App.1938 (1916)). In addition, the committee report for the House Committee on Ways and Means recommended adoption of the legislation to ensure that importers "may be placed in the same position as our manufacturers with refer-ence to unfair competition." *Id.* (quoting H.Rep. No. 922, *supra*). "As Congress apparently was aware, section 2 of the Clayton Act did not apply to international 'dumping' transactions," *Id.* at 1222, and therefore enacted the 1916 Act to reach such conduct by foreign traders.

■ While the legislative history surrounding the enactment of the 1916 is somewhat scarce, the Court finds the statements of Representative Kitchin and the statements regarding the 1916 Act included in the committee report to be indicative of what Congress intended to accomplish when it passed the 1916 Act. When reviewing the legislative history of any statute, the statements in the congressional committee report, which "represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation," *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), are highly authoritative in discerning the Congressional intent of the legislation at issue. Further, the statements of the sponsor of the legislation also provide authoritative guidance in its interpretation. *FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976). "It is the sponsors that we look to when the meaning of the statutory words is in doubt." *National Wood-*

---

marks of Representative Saunders (D–Virginia) as typical of the sentiments expressed by those members of Congress who discussed the 1916 Act:

> Another feature of interest in this bill is the clause containing the antidumping provisions, designed to restrict undesirable foreign importations.... This country is likely to be confronted with a flood of cheap foreign manufactured products on the restoration of peace. In the effort to take over the trade which the wise legislation of the past four years has enabled our manufacturers to secure in every portion of the globe, our competitors in Europe will be likely to resort to cut throat competition under the urge of imperious necessity. Ev-

ery ounce of energy in those countries is now directed toward keeping the machinery of war in motion, and all their business is related to the output of the munition factories. But when the wheels of these factories cease to turn, and the inevitable time of adjustment arrives, the foreign manufacturers of commercial wares must have business, profitable business if possible, but if not profitable, then business on any terms that will bring subsistence to the families of thousands of laborers who will turn from the forging of cannon, and the making of high explosives, to the conversions of swords and spears into implements of prosaic toil.

*Id.* (quoting 53 Cong.Rec.App.1911 (1916)).

*work Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

Thus, the legislative history of the 1916 Act reveals a Congressional intent that the statute be interpreted, whenever possible, consistently with the "unfair competition" law applicable to United States commerce. *Zenith Radio Corporation,* 494 F.Supp. at 1223. Because the 1916 Act is a price discrimination law, courts should read the 1916 Act "in tandem with the domestic price discrimination law, section 2 of the Clayton Act, which was amended by the Robinson–Patman Act in 1936." *Id.*[4] Moreover, the 1916 Act should not be interpreted to "impose on importers legal strictures which are more rigorous than those applied to domestic enterprises." *Id. See also In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 319, 325 n. 4 (3rd Cir.1983) ("The legislative history suggests that the majority party in the Congress at the time passed the Act to deal with unfair competition, and we will interpret the Act in light of its motivating purpose. We are not unaware, however, that protectionist sentiment ran high in Congress and the country at the time [Congress enacted the 1916 Act.]").

### 4. Standard of Comparability of Products Required Under the 1916 Act

■ In light of the Court's conclusion that Congress intended for the 1916 Act to be antitrust in nature, the Court rejects TKS's argument that the term "such arti-

cles" as used in the 1916 Act should be interpreted to require that products be identical in order to be compared under the 1916 Act. The Court also rejects TKS's argument that the 1916 Act requires that products be "commercially interchangeable." TKS's arguments in this regard both find support in customs law and arguably would apply if the Court had concluded that the 1916 Act was primarily protectionist in nature. The Court therefore declines to look to customs law for the proper standard of comparability under the 1916 Act.

The Court's conclusion regarding the 1916 Act is consistent with the view of 1916 Act adopted by the Third Circuit Court of Appeals in *In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 319 (3rd Cir.1983). Accordingly, the Court looks to this case for guidance with respect to the standard for comparability required by the 1916 Act. The Third Circuit Court of Appeals recognized in *In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d at 325, that, to be comparable under the 1916 Act, products must be more than "functional equivalents" or "in the same generic category." *Id.* To read the comparability requirement of the 1916 Act in such an expansive manner, the court opined, would "be inconsistent with the intent of Congress to distinguish legitimate from anticompetitive pricing." *Id.* The court further stated:

4. The court in *Zenith Radio Corporation,* 494 F.Supp. at 1223 n. 44A, recognized that the references in the legislative history of the 1916 Act to "the same unfair competition law" did not specify the Clayton Act as a reference and could be read to refer to the Sherman Act, also in place at the time Congress enacted the 1916 Act. It concluded however, that the Clayton Act was a more appropriate model of construction for the 1916 Act because the Sherman Act is "not concerned primarily with price discrimination, although

pricing behavior may be relevant to its prohibitions of combinations in restraint of trade and of attempted or actual monopolization." *Id.* The fact that Congress passed the 1916 Act as a price discrimination law after section 2 of the Clayton Act, which prohibits price discrimination only in domestic transactions, the court opined, supports the conclusion that Congress intended the 1916 Act to supplement the price discrimination prohibitions of the Clayton Act. *Id.*

Prohibiting price differentials between two non-identical products that serve the same function but appeal to different consumer preferences is as likely to interdict competitive as anticompetitive pricing. We would certainly expect the price of a television encased in a cabinet of mahogany to be different from the price of a television encased in a cabinet of inexpensive plastic, yet the mahogany and plastic sets are arguably functional equivalents.

*Id.*

■ The comparability standard required by the 1916 Act, then, allows for some physical differences between products. The 1916 Act requires, however, that the technical differences between products sold in the United States and those sold in the home market be compared in terms of consumer use and preference and marketability. *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d at 325; *see also Zenith Radio Corporation*, 494 F.Supp. at 1232. Such comparison also must take into account the technological significance of any differences between the products and the difference in production costs occasioned by such differences. *Id.* If the differences between the products are such that, when viewed in terms of consumer utility—taking into account consumer use and preference, marketability and the technological significance of any differences, they do not explain a price differential, such price discrimination is prohibited by the 1916 Act. *Id.*

By way of example, the Third Circuit Court of Appeals in *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d at 325, considered whether television receivers and non-television products sold in Japan were comparable to those sold in the United States under the 1916 Act. The differences between the receivers sold in Japan and those sold in the United States resulted from the fact that the receivers sold in Japan had technical components that made them work in Japan, while those sold in the United States had technical components that made them work in the United States. *Id.* Similarly, the technical differences between the non-television products sold in the United States and those sold in Japan were required by the different power supplies and different radio frequency bands that the two countries assign to their FM radio transmissions. *Id.* Considered in terms of consumer utility—that is consumer use and preference and marketability—the court concluded the purchaser of the both products in Japan purchased the same thing as a purchaser of both products in the United States—an operable television receiver or non-television product. The court determined the technical differences at issue between the products sold in Japan and those sold in the United States could not, when measured in terms of consumer utility, justify a price differential and therefore the products were comparable under the 1916 Act. *Id.* Accordingly, the court reversed the lower court's decision to grant summary judgment in favor of the defendants on the grounds that the products did not meet the standard for comparability under the 1916 Act. *Id.*

In this case, the parties agree there are certain differences between the LNPPs manufactured for use in Japan and those manufactured for use in the United States. They disagree, however, on the significance of those differences for purposes of the 1916 Act. TKS takes the position that the LNPPs manufactured for use in Japan are not commercially interchangeable with those manufactured for use in the United States and vice versa. TKS posits there is no commercial market in Japan for those LNPPs manufactured for use in the United States and, similarly, no commercial market in the United States for LNPPs made for use in Japan.

In resistance to TKS Motion for Summary Judgment on this issue, Goss presents evidence that: (1) TKS has admitted, through the statements of its agent, that the LNPP units sold to the Dallas Morning News in 1994 and 1996 could be compared directly on a price-to-price basis with a TKS printing unit sold in Japan; (2) TKS officers and employees have conceded that TKS builds the same five basic types of printing units for the Japanese and the United States markets; (3) TKS uses identical brochures (with the exception of the language in which they are written) to market these printing units in both Japan and the United States; (4) TKS regularly invites potential United States customers to Japan to examine the Japanese presses in use by Japanese newspapers and produces sample newspapers for these customers on the Japanese presses; (5) TKS produces the presses for both the Japanese and the United States markets on the same production floor, using the same employees and most of the same machines; and (6) many of the printing units sold in the transactions at issue in this case were produced simultaneously and in the same place as those produced for use in the Japanese market. Goss also presents the testimony of its newspaper press engineering expert, Roland T. Palmatier, that "TKS' LNPPs sold in Japan and the U.S. are comparable," and that "TKS essentially sold the same basic product in the U.S. and Japan," and "[t]he pre-production technology, design, construction and value of the LNPPs sold in the U.S. and Japan are very similar, if not identical." Goss asserts that in making these conclusions, Mr. Palmatier undertook an extensive analysis of the similarity of the printing units, product lines, press configurations, inking systems, and number of couples. Goss further points out Mr. Palmatier reviewed specifically the sales at issue in this case and compared the printing unit additions involved in each of the sales to TKS's

reasonably contemporaneous sales of printing units in Japan and in each case he found product matches between the two markets.

■ The Court finds, viewing this evidence in the light most favorable to Goss, that Goss has put forth evidence sufficient to create a genuine issue of material fact with respect to whether the LNPPs manufactured by TKS for use in Japan are comparable to those made for use in the United States. A reasonable juror could conclude, based on this evidence, that the differences between TKS's Japanese presses and those made for use in the United States, when viewed in terms of consumer utility and technical significance, do not render them incomparable for purposes of the price comparison mandated by the 1916 Act. Accordingly, the Court declines to grant to TKS summary judgment on the grounds that the LNPPs made for use in Japan cannot be compared to those made for use in the United States for purposes of the 1916 Act.

TKS also asserts that it is entitled to summary judgment on the issue of comparability because Goss employs a cost-based comparability analysis, or a "price adjustment" analysis in examining the comparability of the prices charged by TKS for its products sold in Japan versus its products sold in the United States. Because the standard for comparability of such products previously articulated by the Court allows for the consideration of differences in production costs occasioned by technical differences in the products, the Court rejects this argument. The Court therefore declines to grant summary judgment in TKS's favor on these grounds.

C. *Whether "Actual Market Value or Wholesale Price" As Used in the 1916 Act is Limited to Wholesale Price or Sales at Wholesale*

TKS's second argument in favor of its Motion for Summary Judgment on Goss's

1916 Act claims is that the phrase "actual market value or wholesale price" requires a comparison of wholesale prices or prices for goods customarily sold in the home market in wholesale quantities and not to ultimate consumers. In support of this contention. TKS highlights the fact that the 1916 Act does not define the terms "actual market value" or "wholesale price." Accordingly, TKS urges the adoption of the definition of such terms included in the 1913 Tariff Act. "Actual market value" is defined in Paragraph R of the 1913 Tariff Act as:

> ... the price at which such merchandise is freely offered for sale to all purchasers in said markets, in the usual wholesale quantities and the price which the seller, shipper, or owner would have received, and was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities, including the value of all cartons ... and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States ....

TKS maintains that the term "wholesale price" should be construed as used in the 1913 Tariff Act and the 1916 Act in accordance with its ordinary meaning. TKS offers several definitions of the term, one of which is, "the sale of goods in large quantities, used for resale by a retailer, as opposed to a sale to the ultimate consumer." In light of these definitions, TKS contends that a foreign seller's United States prices must be compared to (1) the seller's wholesale prices in its home market, not its prices to end users, or (b) the prices of goods the foreign seller sells in its home market in "the usual wholesale quantities." TKS asserts there is no wholesale price for LNPPs sold in Japan and therefore its sale of LNPPs in the United States cannot violate the 1916 Act.

Goss contends that TKS's interpretation of the term "actual market value" used in the 1916 Act is incorrect. Goss maintains that the term "actual market value" included in the 1916 Act cannot mean "wholesale price" because, if it did, the statutory framework would render the term "actual market value" meaningless. Goss urges instead that the term "market value" as used in the 1916 Act should be accorded its plain meaning—"the price which a man can expect to receive," WEBSTER'S NEW INT'L DICT. OF THE ENGLISH LANG. 1320 (1916), or "[t]he price property would command in the market." BLACK'S LAW DICTIONARY 876 (5th ed.1979). Goss points out that neither definition makes any reference to "wholesale price."

The Court agrees with Goss and declines to adopt the strained interpretation of the 1916 Act proposed by TKS. As Judge Melloy held in his order denying the Motions to Dismiss filed previously in this case, where the words of a statute are unambiguous, it is unnecessary to look any further to discern the meaning of such terms. *Goss Graphic Systems v. Man Roland Druckmaschinen Aktiengesellschaft*, 139 F.Supp.2d 1040, 1045 (N.D.Iowa 2001) ("This Court declines Defendants' invitation to parse through sparse legislative history to discern what is readily discernable from the language of the 1916 Act itself."). It is clear from the statutory text that Congress did not intend the terms "actual market value" and "wholesale price" to have the same meaning. If this were the case, Congress would have used one term to the exclusion of the other. The Court therefore declines to grant summary judgment in favor of TKS on the grounds that there is no wholesale market for LNPPs in Japan. The 1916 Act plainly allows for an examination of the actual market value *or* the wholesale price of the

goods in the foreign country when making a determination of whether such goods have been dumped in the United States in violation of the 1916 Act.

### D. Whether TKS's Sales of LNPPs in the United States were "Common and Systematic" for Purposes of the 1916 Act

TKS also moves for summary judgment in this case on the grounds that Goss cannot establish that TKS made "common and systematic" sales of LNPPs under the 1916 Act during the five-year period beginning in 1995 and ending in 2000. Goss argues in response that a determination of whether TKS's sales under the 1916 Act were "common and systematic" requires an analysis of both the sales and the imports made by TKS. Goss presents evidence that TKS made more than 90 sales or imports between 1992 and 2000 and contends that such evidence is sufficient to establish "common and systematic" sale or importation of LNPPs by TKS in this case.

The meaning of the words "common" and "systematic" as used in the 1916 Act is readily ascertainable. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F.Supp. 251, 256 (E.D.Pa. 1975). "Whatever is done 'commonly' is done with considerable frequency, as a matter of general practice. Whatever is done 'systematically' is done regularly, in a recurring pattern." *Id.* The Court finds that Goss has presented evidence sufficient to create a genuine issue of material fact on the issue of whether TKS's sale and importation of LNPPs in the United States was "common and systematic" for purposes of the 1916 Act. The Court therefore declines to grant summary judgment in favor of TKS on this issue. The Court

recognizes that Goss includes in its evidence regarding the allegedly common and systematic nature of TKS's sales and imports into the United States conduct which occurred outside the applicable limitations period.[5] However, the Court ruled in its November 17, 2003 Order Regarding Statute of Limitations and Goss's Profit Erosion Claims that such evidence is admissible because it is relevant to the issue of whether TKS acted commonly and systematically for purposes of the 1916 Act. *Cf. Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 356 (8th Cir. 1997) (holding evidence of incidents occurring outside of the limitations period for filing a timely administrative charge of discrimination that are relevant to the ultimate question of whether discrimination occurred may be considered by the court or a jury in evaluating a claim of discrimination).

### E. Did TKS Sell and Import Its LNPPs in the United States With the Intent to Cause Competitive Injury to Goss Rather than Simply to Win or to Retain Specific Customers?

TKS maintains, as an additional ground for its Motion for Summary Judgment, that Goss is unable as a matter of law to show that TKS acted with the intent required by the 1916 Act. TKS contends that evidence of "specific intent" is required to establish a violation of the 1916 Act. In support of such contention, TKS cites *Geneva Steel Co. v. Ranger Steel Supply Corp.*, 980 F.Supp. 1209, 1224 (D.Utah 1997), a case on which Judge Melloy relied in his opinion addressing Defendants' Motion to Dismiss in this case. The *Geneva Steel* court opined:

5. The Court notes that Congress did not include in the 1916 Act a statute of limitations. The Court addresses the issue of the statute of limitations applicable to the 1916 Act in its

November 17, 2003 Order Regarding Defendants' Motion in Limine Regarding on the Statute of Limitations and Goss's Profit Erosion Claims.

The 1916 Antidumping Act in no way criminalizes normal competition or capitalism. It simply forbids dumping below market value goods in America with the intent to injure an American industry. As stated earlier, the burden of proving such improper intent may not be easy. Absent some compelling evidence, it may be nearly impossible. An expected defense in this type of case is that the importer was motivated by making a profit for himself, not injuring an industry in the United States, and therefore lacked the necessary intent to injure. Mere knowledge on the part of the importer that his sales will capture business away from his United States competitors, standing alone, will not be sufficient to demonstrate an intent to injure the entire United States ... industry and will therefore be inadequate to establish a violation of the Act.

980 F.Supp. at 1224. TKS also calls the Court's attention to the legislative history of the 1916 Act which TKS asserts supports the idea that the concept of "injury" used in the 1916 Act means injury to the domestic industry's competitive viability. TKS concludes, based upon its review of the legislative history of the 1916 Act and the case law addressing the 1916 Act, that a plaintiff seeking to establish a violation of the 1916 Act must show that the defendant: (a) specifically identified the United States industry as a target for injury or destruction; (b) systematically dumped its products with the intention of driving the domestic industry into bankruptcy or permanently impairing its ability to remain competitive; and (c) did so in the belief that the defendant ultimately would be able to exploit the United States market for the product. TKS posits that its efforts simply to retain its few existing customers and to avoid abandonment of the United States market, which it characterizes as normal competitive conduct, cannot

reasonably be interpreted to reflect an intent to injure or to destroy Goss.

Goss responds that TKS's interpretation of the type of intent required under the 1916 Act is not consistent with Judge Melloy's opinion on this issue expressed in *Goss Graphic Systems:*

> the language of the Act itself, in addition to prohibiting antitrust violations, clearly and literally prohibits non-antitrust and non-predatory pricing conduct. By the words it chose, Congress protected United States industries from unfair dumping, whether the dumper possessed predatory intent or not. The intent required is the intent to "injure" a domestic United States industry. When the Act states that it is unlawful to sell dumped goods with the specific intent to injure a United States industry, it means precisely that. The Defendants want to add the limitation that such injury can only occur if predatory pricing is involved, but the Act simply does not say so.

139 F.Supp.2d at 1048. Goss interprets TKS's articulation of the level of intent required under the 1916 Act to mandate some form of heightened or predatory intent, which Goss contends was explicitly rejected by Judge Melloy in his opinion on Defendants' Motion to Dismiss in this case.

■ This Court does not interpret TKS's characterization of the intent required under the 1916 Act to impose the requirement that the alleged dumper act with predatory intent. However, the Court agrees that TKS's position on this issue—that an "intent to injure" means an intent to drive a United States industry into bankruptcy or to challenge ability to remain viable—is inconsistent with the standards set forth by Judge Melloy. Judge Melloy held that the 1916 Act "clearly and unambiguously prescribes five ways in which one might prove a defen-

dant's intent to discriminate regarding price," including intent: (1) to destroy a United States industry; (2) to injure a United States industry; (3) to prevent the establishment of a United States industry; (4) to restrain trade and commerce in the subject market; or (5) to monopolize trade and commerce in the subject market. *Goss Graphic Systems, Inc.,* 139 F.Supp.2d at 1047. Given Judge Melloy's finding that the statute is clear on its face with the respect to the issue of the intent required, the Court declines to read into the statute the restrictive meaning of the word "injure" urged by TKS.

In resistance to TKS's Motion for Summary Judgment on this issue, Goss presents evidence that in 1993, Mr. Morimoto, a high-ranking officer and director of TKS in Japan. sent a facsimile transmission to Mr. Norris, an employee of TKS (U.S.A.) which provided in pertinent part as follows:

> If Goss wants to sling mud at TKS in such dirty strategy (special 25% discount or one tower as gift to sell 3 towers) to destroy TKS, I believe TKS must do something like an eye for an eye, a tooth for a tooth. Look here, Goss, TKS will show them a thing or to—three—four ..... in Japan, Asia, U.S.A. & in any other territory until TKS wins completely this survival game....

Goss also adduces evidence that TKS undertook efforts to artificially inflate the price of its 1996 sale to the Dallas Morning News. Goss presents evidence that TKS and the Dallas Morning News agreed in writing to one price for the sale and then subsequently covertly reduced the price of the sale through TKS's agreement to give the Dallas Morning News a secret $2.2 million rebate on the price of the sale. ▮ The Court finds, giving Goss the benefit of all reasonable inferences to be made from this evidence as it must when considering TKS's Motion, that Goss's evidence is sufficient to create a genuine issue of material fact with regard to whether TKS intended to injure or to destroy a United States industry. Given the percentage of the LNPP market share enjoyed by Goss during the time period relevant to this case, it is fair to say that Goss was the only major manufacturer of LNPPs in the United States. In other words, Goss *was* the United States LNPP industry. The evidence submitted by Goss shows that Mr. Morimoto is a high ranking officer and director of TKS. He stated in his fax to Mr. Norris that TKS would retaliate against Goss for its attempt to undercut TKS in a sale and that TKS would win the survival game. A reasonable juror could conclude from Mr. Morimoto's statements that TKS intended to take steps to put Goss out of business. Moreover, a reasonable juror also could conclude from the evidence concerning TKS's alleged attempt to cover up a sale made at an allegedly dumped price that TKS intended to injure Goss by preventing Goss from obtaining the sale. Thus, the Court declines to grant summary judgment in favor of TKS on the issue of whether Goss can prove that TKS acted with the intent to injure Goss in this case.

### F. Did TKS's Pricing Cause Destructive—or Any—Injury to Goss Cognizable Under the 1916 Act?

In its final argument in favor of its entitlement to summary judgment on Goss's 1916 Act claims in this case, TKS asserts that Goss is unable to show that TKS's actions resulted in any damage to Goss cognizable under the 1916 Act. In support of this assertion, TKS maintains that Goss's damages expert, Raymond Sims, admits that Goss is unable to prove that TKS's pricing caused any injury to Goss. TKS posits that Mr. Sims damage analysis consists of lost profits on six spe-

cific contracts won by TKS, including the 1999 contract, "eroded profits" on four specific contracts won by Goss, and lost interest on those profits, none of which demonstrate the competitive injury required by the 1916 Act.

In response, Goss presents evidence that it suffered the following damages as a result of TKS's alleged dumping in this case: (1) lost sales on contracts for which Goss and TKS directly competed and which TKS obtained allegedly because of its "dumped" pricing; (2) lost profits for "price erosion" on sales that Goss won but at prices that were suppressed because of TKS's below-market pricing and bids; and (3) a loss in dumping duties to which Goss would have been entitled under the Byrd Amendment but for TKS's alleged deceit of the Department of Commerce ("DOC").

The Court's review of the record leads it to conclude that Goss has put forth evidence sufficient to generate a genuine issue of material fact on the issue of whether TKS's alleged dumping caused Goss to suffer lost profit and price erosion damages in this case. Accordingly, the Court declines to enter summary judgment in favor of TKS on the grounds that Goss is unable to prove lost profit and profit erosion damages as a result of TKS's actions in this case.

In addition to lost profit and profit erosion damages, Goss seeks to recover in this 1916 Act case damages for amounts it allegedly could have recovered under the Byrd Amendment in the 1930 Tariff Act proceeding against TKS. Goss maintains that if TKS had accurately disclosed information to the DOC with respect to four of the sales at issue, Goss would have been entitled under the Byrd Amendment to receive any dumping duties assessed against TKS for such sales under the 1930 Tariff Act. Goss has provided the Court with no authority in support of the proposition that it is entitled to recover damages

in this 1916 Act for losses it allegedly suffered under the 1930 Tariff Act. The Court therefore holds that Goss is not entitled to Byrd Amendment damages in this 1916 Act case. Accordingly, the Court grants summary judgment in favor of TKS on Goss's claim for damages under the Byrd Amendment.

## IV. CONCLUSION

In light of the foregoing, IT IS ORDERED:

1. Goss's Motion for Summary Judgment (docket no. 340) is GRANTED with respect to the following affirmative defenses asserted by TKS: (a) Goss's failure to mitigate its damages; (b) the Antidumping Act of 1916 contravenes international obligations; and (c) the Antidumping Act of 1916 is unconstitutionally vague. Goss's Motion is DENIED with respect TKS's remaining affirmative defenses.

2. TKS's Motion for Summary Judgment (docket no. 343) is DENIED.

**IT IS SO ORDERED.**